**E-Filed 11/4/2009**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| ZL TECHNOLOGIES, INC., | Case Number CV 09-02393 JF (RS) |
| Plaintiff, | ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND IN PART |
| v. | |
| GARTNER, INC. and CAROLYN DiCENZO, | [re: docket no. 13] |
| Defendants. | |

Defendants Gartner, Inc. and Carolyn DiCenzo (collectively, "Gartner") move to dismiss the complaint of Plaintiff ZL Technologies, Inc. ("ZL"), pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons set forth below, the motion will be granted, with leave to amend in part.

## I. BACKGROUND

### 1. Procedural Background

ZL filed the instant action on May 29, 2009, alleging seven claims for relief: (1) defamation of character; (2) trade libel; (3) false statements under § 43(a) of the Lanham Act concerning Gartner's products and services; (4) false statements under § 43(a) of the Lanham Act concerning products of Symantec Corporation ("Symantec"); (5) false or misleading advertising under California Business and Professions Code § 17500; (6) unfair competition under California Business and Professions Code § 17200; and (7) negligent interference with prospective economic advantage.

**2.     Factual Allegations of the Complaint**

ZL alleges the following facts, which are presumed to be true for the purpose of a motion to dismiss.

**A. The Parties**

ZL is in its eleventh year of making and selling "software for large enterprises to store, index, search, extract and purge electronic data, primarily in the form of email and files." Complaint ¶ 20.  Its target market consists of large enterprises.  *Id.*  ZL alleges that it is primarily self-funded and that it has avoided seeking large amounts of venture capital funding in order to retain its independence and make business decisions for the long-term benefit of its enterprise customers.  *Id.* ¶ 22.  ZL alleges that it has the "strongest product offering in the marketplace." *Id.* ¶ 23.

Gartner, which identifies itself as "the world's leading information technology research and advisory company," provides analysis of the information technology industry to paying corporate and executive customers.  *Id.* ¶ 2.  Gartner sells its research reports and makes recommendations to clients about products in the information technology field.  It advertises that it is especially well-suited to provide such advice based upon its "combined brainpower of 1,200 research analysts and consultants who advise executives in 80 countries every day," its "publi[cation] of tens of thousands of pages of original research annually and answer[ing] 200,000 client questions every year," its "relevant experience and institutional knowledge [that] prevent[s] costly and avoidable errors," and its ability to "show you how to buy, what to buy, and how to get the best return on your technology investment." *Id.* ¶ 17, citing http://www.gartner.com/it/about/why_use_gartner.jsp, visited May 27, 2009.  One of Gartner's research areas is email archiving.  *Id.* ¶ 24.  Email archiving is a method of storing "large amounts of emails (and attachments) by...offload[ing] and stor[ing] those emails in a separate repository which is much cheaper to maintain than a primary email server."  *Id.* ¶24.  Email archiving supports business and governmental organizations in complying with various statutory regimes, and records management.  *Id.* ¶¶ 24-26.  DiCenzo is Gartner's lead analyst for the email active archiving market.  *Id.* ¶ 3.

2

**B. Allegations of Wrongdoing**

ZL identifies three categories of alleged false or misleading statements ("Alleged Defamatory Statements"): (1) ZL's ranking in Gartner's Magic Quadrant ("MQ") Report, *id.* ¶¶ 28-32; (2) "Cautions" about ZL in the MQ Report, *id.* ¶ 33; and (3) "Other statements", *id.* ¶ 34.

**1. MQ ranking**

The MQ Report on information technology vendors allegedly is a "key revenue driver" for Gartner and "heavily influences" Gartner's customers. *Id.* ¶ 4. The Report claims to "accurately rank IT vendors for enterprise buyers in a propriety map called 'the Magic Quadrant' which simply divides vendors into four quadrants in declining order of desirability as follows: Leader, Challenger, Visionary, Niche." *Id.* ¶ 5. The axes of the four quadrants measure a vendor's "ability to execute" and "completeness of vision." *Id.* ¶ 29. The "ability to execute" variable is based upon Gartner's assessment of the "quality of goods and services, overall viability, sales execution, market responsiveness and track record, marketing execution, customer experience, and operations." *Id.* ¶ 30. The "completeness of vision" axis is premised on the evaluation of a vendor's "market understanding, market strategy, sales strategy, product strategy, business model, industry strategy, innovation, and geographic strategy." *Id.* ¶ 31. ZL alleges that its designation as a Niche Player is derogatory because the designation is accepted by Gartner customers as a "warning" that ZL's enterprise email archive applications are not good products. *Id.* ¶ 32.

Gartner first included ZL in an MQ Report in 2005, and it always has ranked ZL in the "Niche" quadrant. *Id.* ¶ 6. ZL alleges that at the same time Gartner always has ranked Symantec in the most desirable "Leader" quadrant, thereby creating a "perceived vendor gap" in the ranking of Symantec and ZL. ZL alleges that this "vendor gap" is false or misleading because ZL's software is "far superior to the offerings from Symantec and other competitors in the MQ Report," *id.* ¶¶ 7, 41-67 (detailing ZL's superior software, including but not limited to, its ability to: out-perform Symantec by over a thousand-fold in search speed of enterprise-wide searches; search with more accuracy than Symantec; scale to one to two orders of magnitude above Symantec in any given vault; and reduce the cost of servers, storage and administrative overhead

3

to half that associated with Symantec).  ZL alleges that its misleading ranking is understood by prospective consumers in the context of Gartner's self-identification as a provider of "highly discerning research that is objective, defensible, and credible to help [customers] do their job better."  *Id.* ¶ 16.

The complaint alleges that in fact the MQ Report is "highly subjective," *id.* ¶ 71, that "[t]here is no mathematical discipline which can compute to a definitive point on the [MQ] map," *id.,* that [t]he process must necessarily degrade into a subjective assessment," *id.*, and that Gartner did not expend a "single minute of independent testing of the products." *Id.* ¶19.  ZL claims that Gartner does not disclose the relative weight it gives to the different criteria upon which vendors are ranked along the axes of "ability to execute" and "completeness of vision," and that this practice allows for "arbitrary and misleading assessments."  *Id.* ¶ 70.  ZL alleges that it has objected repeatedly to Gartner's MQ Report recommendations.  It points to a statement made by Gartner for the first time in the 2009 MQ Report indicating that Gartner's rankings are based primarily upon two factors: "(a) good product and (b) good sales and marketing."  *Id.* ¶ 9. ZL alleges that Gartner, which has a major influence in the media, wrongly evaluated ZL's product in comparison to Symantec, largely as a result of Gartner's valuation of "marketing puffery over serious technology."  *Id.* ¶ 10.  ZL claims that "[b]ecause market research could not support the [Alleged] Defamatory Statements, Gartner knew, or was reckless as to the fact that, the...statements were false."  *Id.* ¶ 97.  ZL contends that the inappropriate value given by Gartner to good sales and marketing leads to a bias in favor of larger companies that are able to expend resources on such efforts.  *Id.* ¶ 10.  ZL asserts that Gartner's MQ rankings have injured ZL and "destroyed fair competition – which has resulted in injury to the public interest."  *Id.*

### 2. **Cautions in the MQ**

According to ZL, the 2008 MQ Report warned that, "ZL is primarily a product and engineering-focused company.  To remain [a] viable vendor in the market, the company must gain greater visibility and more aggressively expand its sales channels."  Id. ¶ 33.

### 3. **Other Statements**

ZL alleges that DiCenzo and other Gartner representatives made negative statements

4

1  about ZL and its products, including that the "ZL Products and Symantec's Enterprise Vault (EV)
2  'were the same.'" *Id.* ¶ 34.

3      **C. Alleged impact of Gartner's statements**

4      ZL claims that Gartner recklessly "campaign[ed]" to hoist its champion, Symantec, to the
5  'Leader' position, while ZL languished as a 'Niche' player," and that DiCenzo, in her capacity as
6  a Gartner analyst, "actively discouraged prospective customers regarding the purchase of ZL
7  products." *Id.* ¶ 87.  In particular, ZL alleges that the Department of Veterans Affairs made a $16
8  million purchase of certain leases and services from Dell based entirely on the MQ Report.  *Id.* ¶
9  37.  ZL also alleges that its own prospective customers "consistently and uniformly" raise
10 concerns about ZL products because of the Alleged Defamatory Statements.  *Id.* ¶ 36.  According
11 to ZL, Oracle Corporation "complains that it gets 'Gartnered'" when it attempts to resell ZL
12 products.  *Id.* (explaining that the term "Gartnered" has been used by Oracle to describe how a
13 prospective customer "would not even consider looking at the ZL Products because of the low
14 Gartner rankings.").

15     ZL alleges many instances in which it has lost sales and business opportunities as a result
16 of the MQ Report.  *Id.* ¶ 88 (listing a services company of over 140,000 employees, a medical
17 university with 15,000 employees, a large supplier of electronics with over 90,000 employees,
18 etc.).  The complaint also alleges that the "most significant injuries" ZL suffers are related to
19 those potential customers with which it never makes contact because the customers do not even
20 consider ZL in light of its MQ ranking. *Id.* ¶ 90.

21     Finally, ZL claims that beyond causing injury to itself, the MQ Report has hurt the public
22 by negatively impacting competition and "the innovation engine which drives the American
23 economy."  *Id.* ¶ 8.  ZL alleges that this injury is a result of the MQ Report's "lack of
24 transparency" and "bias[] in favor of large vendors with large sales and marketing budgets."  *Id.*
25 ¶ 91.

26     **II. LEGAL STANDARD**

27     A complaint may be dismissed for failure to state a claim upon which relief may be
28 granted if a plaintiff fails to proffer "enough facts to state a claim to relief that is plausible on its

5

face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Allegations of material fact must be taken as true and construed in the light most favorable to the nonmoving party.  *Pareto v. FDIC*, 139 F.3d 696, 699 (9th Cir. 1998), *see also Cahill v. Liberty Mut. Ins. Co.,* 80 F.3d 336, 337-38 (9th Cir. 1997).  However, the Court need not accept as true allegations that are conclusory, unwarranted deductions of fact, or unreasonable inferences.  *See Sprewell v. Golden State Warriors,* 266 F.3d 979, 988 (9th Cir. 2001); *see also Twombly*, 550 U.S. at 561 ("a wholly conclusory statement of [a] claim" will not survive motion to dismiss).  Leave to amend should be granted unless it is clear that the complaint's deficiencies cannot be cured by amendment. *Lucas v. Dep't of Corr.*, 66 F. 3d 245, 248 (9th Cir. 1995).  When amendment would be futile, dismissal may be ordered with prejudice.  *Dumas v. Kipp*, 90 F.3d 386, 393 (9th Cir. 1996).

Under the incorporation by reference doctrine, the Court may consider "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading." *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir.1999) (quoting *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir.1994)) (alteration in original); *see also In re Stac Elcs. Sec. Litig.*, 89 F. 3d 1399, 1405 n.4 (9th Cir. 1996) (noting that complete copies of documents whose contents are alleged in the complaint may be considered in connection with a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)).

### III. DISCUSSION

#### A. Lanham Act Claims

##### 1. Standing

The Ninth Circuit standard for establishing standing pursuant to the false advertising prong of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), requires a plaintiff to show: "(1) a commercial injury based upon a misrepresentation about a product; and (2) that the injury is 'competitive,' or harmful to the plaintiff's ability to compete with the defendant." *Jack Russell Terrier Network of Northern Ca. v. American Kennel Club*, 407 F.3d 1027, 1037 (9th Cir. 2005). ZL does not allege that the injury in this case is "competitive" and in fact concedes that it does not satisfy the second element of the Ninth Circuit standard.  Opp. MTD at 20.  Nonetheless, ZL contends that it has standing to bring a Lanham Act false advertising claim under the "reasonable

6

prudential standing approach" that has been adopted by the Third, Fifth and Eleventh Circuit. *Phoenix of Broward, Inc. v. McDonald's Corp.*, 489 F.3d 1156, 1163 (11th Cir. 2007), cert. denied, – U.S. –, 128 S.Ct. 1647, 170 L.Ed.2d 385 (2008); *Procter & Gamble Co. v. Amway Corp.*, 242 F.3d 539, 562 (5th Cir. 2001); *Conte Bros. Auto., Inc. v. Quaker State-Slick 50 Inc.*, 165 F.3d 221, 230 (3rd Cir. 1998); *see contra Ott v. Ingenix, Inc.*, No. CV-07-201-FVS, 2008 WL 4459411 at *1 (E.D. Wash. 2008) (recognizing that the "Ninth Circuit has not employed the doctrine of prudential standing in the context of § 1125(a)" and that "the Ninth Circuit has held that a person seeking relief under § 1125(a) must have standing to bring the claim."). This Court declines ZL's invitation to expand the principles of Lanham Act standing beyond those recognized by the Ninth Circuit.[1]

Finally, even if the Court were to apply the prudential standing approach, ZL fails to explain in its opposition how its allegations of fact support the first statutory factor – that the alleged injury "is the injury of a type that Congress sought to redress in providing a private remedy for violations of the Lanham Act." *Phoenix of Broward*, 489 F.3d at 1163-64, citing *Conte Bros. Automotive, Inc.*, 165 F.3d at 233.[2]

**2. The Challenged Statements**

"To prevail on...a Lanham Act...claim, Plaintiffs must show that the...challenged

---

[1] ZL contends that the Ninth Circuit has not uniformly required that plaintiff and defendant be competitors to support a finding that plaintiff has standing. *National Services Group, Inc. v. Painting and Decorating Contractors of America, Inc.*, 2006 WL 2035465 (C.D. Cal. July 18, 2006) and *Coastal Abstract Service, Inc. v. First American Title Insurance*, 173 F.3d 725 (9th Cir. 1999). However, the cases upon which ZL relies are inapposite. In *National Services Group*, the defendant was a trade group whose members were direct competitors of the plaintiff and in *Coastal Abstract Service Group*, the defendant was a corporate official employed by the plaintiff's competitor. Conceivably, facts supporting a conclusion that Gartner was acting on behalf of one of ZL's competitors rather than as an independent evaluator would be more analogous, but the Court has grave doubts as to whether such facts could be alleged truthfully or consistent with the requirements of Fed. R. Civ. P. 11.

[2] ZL's failure to allege that ZL and Gartner are competitors also undercuts the claim that the Alleged Defamatory Statements qualify as "Advertising." *Coastal Abstract Service Group*, 173 F.3d at 735 (requiring, among other factors, that alleged commercial speech be by "a defendant who is in commercial competition with plaintiff.")

7

statements 'expressly or impliedly assert [facts] that [are] susceptible to being proved false.'"
*National Services Group, Inc. v. Painting and Decorating Contractors of America, Inc.*, 2006
WL 2035465, at *6 (C.D. Cal. July 18, 2006), citing *Coastal Abstract Service, Inc. v. First
American Title Ins. Co.*, 173 F.3d 725, 730 (9th Cir. 1999).  In this case, even assuming that it
has standing to assert a Lanham Act claim, ZL has failed to identify any actionable statements.
Although it alleges that Gartner has falsely stated that:  (a) "'its research is 'high quality,
independent and objective research', (b) it is a 'thought-leader' in information technology, [and]
(c) it can 'show how to get the best return on your technology investment,'" Complaint ¶ 18,
such alleged "misdescriptions" do not pertain to "specific or absolute characteristics," but
properly are construed as non-actionable puffery because they are not factually verifiable.
*Southland Sod Farms v. Stover Seed Co.,* 108 F.3d 1134, 1145 (9th Cir.1997); *see also
Anunziato v. eMachines Inc.*, 402 F. Supp. 2d 1133, 1139 (C.D. Cal. 2005) (holding that the
representations concerning the "outstanding quality, reliability, and performance" of a product
were non-actionable puffery."); *see also Coastal Abstract Serv. Inc.,* 173 F.3d at 731 (9th Cir.
1999) (holding that the implication or statement that defendant was large enough to handle a
client's business is not an actionable false or misleading statement of fact).[3]

The Lanham Act claim is the sole basis for federal jurisdiction alleged in the operative
complaint.  However, ZL's counsel represented at oral argument that if it were granted leave to
amend, ZL also could assert federal jurisdiction on the basis of diversity of citizenship.  For this
reason, the Court will address ZL's remaining claims.

**B. State-Law Claims**

ZL asserts six additional claims under California law.  Each claim is dependent upon a
conclusion that the Alleged Defamatory Statements are false or misleading statements of fact.
Because it concludes that all of the statements are non-actionable opinions, the Court will grant
the motion to dismiss as to each of the claims.

---

[3]  To the extent that ZL's Lanham Act claim applies to statements about Symantec, the
relevant statements are discussed below.  *See infra* III.B.1.

An expression of pure opinion is protected by the First Amendment and may not form the

basis for a civil law suit.  *Jensen v. Hewlett-Packard Co.*, 14 Cal.App.4th 958, 970 (Cal. Ct. App.

1993) (holding that an opinion cannot form the basis of a defamation claim); *ComputerXpress,*

*Inc. v. Jackson*, 93 Cal.App.4th 993, 1010-11 (Cal. Ct. App. 2001) (determining that an opinion

cannot form the basis of a trade libel claim); *Coastal Abstract Serv., Inc.,* 173 F.3d at 730-31

(concluding that a Lanham Act claim requires a false or misleading statement of fact, not

opinions); *Bernardo v. Planned Parenthood Fed'n of Am.*, 115 Cal.App.4th 322, 349-50, 356

(Cal. Ct. App. 2004) (concluding that plaintiffs did not have a reasonable likelihood of prevailing

on the merits because an "opinion" was insufficient to state a claim of false advertising or an

unfair competition claim); *Cf. Carafano v. Metrosplash.com, Inc.*, 207 F.Supp.2d 1055, 1075-76

(C.D. Cal. 2002) (concluding that when a negligence and defamation claim are premised on the

same allegedly false statements, that the negligence claim fails when the alleged statements are

determined not to be defamatory); Complaint ¶ 127 (premising ZL's negligence claim solely on

the Alleged Defamatory Statements being "false").  The parties dispute whether the Alleged

Defamatory Statements are opinions or statements of fact.

### 1.  Defamation and Libel

The Ninth Circuit employs a three-part test in determining whether alleged defamatory

statements are opinions or assertions of fact: "(1) whether the general tenor of the entire work

negates the impression that the defendant [is] asserting an objective fact, (2) whether the

defendant used figurative or hyperbolic language that negates that impression, and (3) whether

the statement in question is susceptible of being proved true or false."  *Partington v. Bugliosi*, 56

F.3d 1147, 1153-60 (9th Cir. 1995), citing *Unelko Corp. v. Rooney*, 912 F.2d 1049, 1053 (9th Cir.

1990); *Gardner v. Martino,* 563 F.3d 981, 987 (9th Cir. 2009), citing *Knievel v. ESPN*, 393 F.3d

1068, 1075 (9th Cir.2005) ("noting the three parts for the 'totality of the circumstances' test as

(1) the broad context; (2) the specific context and the content of the statement; and (3) whether

the statement is sufficiently factual to be susceptible of being proved true or false.")

**A. Whether the General Tenor of the Entire Work Negates the Impression that the Defendant Was Asserting an Objective Fact**

The Court agrees with Gartner that the general tenor of the MQ Report negates the impression that Gartner is asserting an objective fact by assigning ZL a "Niche" status.  The cover page of the email archiving review states specifically that, "The *opinions* expressed herein are subject to change without notice."  Gartner's Request for Judicial Notice ("RJN"), Exs. A (2007 MQ Report) at 1, B (2008 MQ Report) at 1, C (2009 MQ Report) at 1 (emphasis supplied). ZL contends that the "presence of alleged disclaimers" does not compel dismissal, as any defamatory claim conceivably could be negated by the presence of a "footnote."  Opp. MTD at 12, citing *Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, No. 08 Civ. 7508 (SAS) 2009 WL 2828018, at *9-10 (S.D.N.Y. Sept. 2, 2009) (citation omitted) (holding that defendant rating agency's ratings were non-actionable opinions because an opinion still may be actionable if the speaker does not genuinely and reasonably believe it or if it is without basis in fact.)  In the present case, however, it is evident that the disclaimer does contribute to a "general tenor of the entire work [that] negates the impression that [Gartner] was asserting an objective fact." *See Partington,* 56 F.3d at 1153, *see also id.* at 1155 (advising in the context of a defamation suit that "authors...must attempt to avoid creating the impression that they are asserting objective facts rather than merely stating subjective opinions").

In addition, the MQ Report explicitly reflects Gartner's "view" with respect to "proper vendor placement," and states specifically that it is based on "more than 1,000 conversations over the past year with Gartner customers, as part of [its] inquiry service, survey responses and updates from the vendors in the March/April 2009 time frame, and over 70 conversations with vendor-supplied references in March and April 2009."  RJN, Ex. C at 2-3.  Gartner unambiguously presents the MQ results as a reflection of its subjective "views" or "opinions," not as objective facts.  Gartner also identifies the bases of its opinion:  not product performance testing, but conversations with customers and vendor-supplied references, as well as surveys completed by vendors.

The "views" Gartner develops from its conversations and surveys are presented in the

10

MQ Report along two axes.  The criteria upon which vendors are rated – "ability to execute" and "completeness of vision" – "contribute[] to the general tenor of the ranking being subjective." *Browne v. Avvo Inc.* 525 F.Supp.2d 1249, 1252 (W.D. Wash. 2007) (noting that defendant's use of "fuzzy descriptive phrases like 'superb,' 'good,' and 'strong'" in ranking attorneys on its website contributed to the general tenor of the rankings being subjective and concluding that "a reasonable reader would understand that these phrases and their application to a particular attorney are subjective.")  Gartner defines these criteria in the text of the MQ Report.  *See* Complaint ¶ 30 (identifying the "Ability to Execute" criteria as quality of goods and services, overall viability, sales execution, market responsiveness and track record, marketing execution, customer experience, and operations); *id.* ¶31 (identifying the "Completeness of Vision" criteria as market understanding, market strategy, sales strategy, product strategy, business model, industry strategy, innovation, and geographic strategy).  Each of these assessments is attributed explicitly to conversations with customers, vendor surveys, and conversations with vendor-supplied references.

While criteria such as "quality of goods" and "market responsiveness and track record" conceivably might be amenable to objective testing and verification, Gartner nowhere states or implies that such testing or verification has been performed.  As ZL itself alleges, "the MQ is...highly subjective.  There is no mathematical discipline or process disclosed which can compute to a definitive point on the MQ map.  Absent such mathematical discipline in determining an MQ placement, the process must necessarily degrade into a subjective assessment." *Id.* ¶ 71.

Finally, ZL argues that Gartner's representation that it provides "highly discerning research that is objective, defensible, and credible to help [customers] do their job better" implies that its Reports contain objective assertions of fact.  Opp. MTD at 10, citing Complaint ¶ 16.  Gartner notes that this language appears not in the MQ Report but on its website and that the language describes Gartner's research services generally rather than the MQ Report in particular.  More to the point, the terms "objective, defensible, and credible" do not imply the assertion of factual information.  Gartner argues convincingly that even if its self-description did refer to the

1    statements within the MQ Report, its "sophisticated readers" – corporate and government

2    executives and professionals – would not infer that Gartner's rankings were anything other than

3    opinion.  Gartner's Reply at 5.  Gartner contends that its use of the word "objective," reasonably

4    represents that its rankings are arrived at through "independent and unprejudiced" methods.  *Id*.

5    Gartner also argues persuasively that the word "defensible" simply means "capable of being

6    defended."  *Id.*  While its use of the word "credible" reflects Gartner's belief that its ratings are

7    trustworthy, such use cannot reasonably be understood as a statement of fact.

8    **B. Whether the Specific Content and Context of the Statements,**
     **including the Use of Figurative or Hyperbolic Language, Negates the**
9    **Impression of an Assertion of Fact**

10   ZL contends that because the MQ Report lacks hyperbolic language, identifies Gartner's

11   research as "objective, defensible, and credible," and goes to "great length to ensure that the

12   Reports and its research are taken as sober, technical evaluations" the Court should find that the

13   specific content and context of the statements give the impression of an assertion of fact.  Opp.

14   MTD at 10.  It is true that the MQ Report does not utilize hyperbolic language, and that Gartner

15   represents that its research and Reports are "objective, defensible and credible."  However, this

16   does not end the inquiry with respect to the second part of the *Partington* test.  *Partington*, 56

17   F.3d at 1155-56 (examining the specific context of the alleged defamatory statements beyond

18   whether it is hyperbolic or jocular in nature).  The actual context of the ratings in the MQ Report

19   is found in the axes upon which a given vendor is rated.  As discussed above, the axes are

20   subjective on their face, and a given vendor's placement reflects Gartner's interpretation and

21   opinion.  *See supra,* III.B.1A; *see also* RJN Ex. C at 18-19.

22   **C. Whether the Statement in Question is Susceptible of Being Proved**
     **True or False**
23

24   In its opposition papers, ZL alleges that Gartner has stated that "ZL and ZL's products are

25   not good choices for enterprise email archive applications" and that "ZL's offerings are

26   significantly inferior to Symantec['s]." Opp. MTD at 10-11, citing Complaint ¶¶ 32, 68.

27   However, these allegations appear nowhere in the complaint.  The complaint does allege, in

28   Paragraph 32, that the "MQ placements were, and are, derogatory because they are understood by

12

1  technology purchasers as a warning, by Gartner, that ZL and the ZL Products are not good

2  choices for enterprise email archive applications." There is no allegation that Gartner actually

3  said that ZL is not a good choice; instead, ZL claims that its placement in the MQ Report would

4  lead a customer to believe that ZL is not a good choice. As discussed above, a vendor's

5  placement in the MQ Report is not a statement that can be proved true or false. The complaint

6  reflects ZL's disagreement with Gartner's determination as to the relative importance of rating

7  criteria, *see e.g.* Complaint ¶ 10 (admitting that "at the core of this action are not only the

8  reckless statements made by Gartner as an influential member of the media, but an economic

9  model championed by Defendants that elevates marketing puffery over serious technology"), but

10  that determination by definition is an opinion and not capable of being proved true or false.

11      In *Browne v. Avvo Inc.,* 525 F.Supp.2d 1249, 1252 (W.D. Wash. 2007), the court

12  confronted a similar factual situation. The plaintiffs disagreed with the weight given by the

13  defendant to certain evaluative criteria in determining its ranking of the attorneys the defendant

14  had evaluated. In granting the defendant's motion to dismiss, the court concluded that "the

15  underlying data is weighted based on [defendant's] subjective opinions regarding the relative

16  importance of various attributes...How an attribute is scored and how it is weighed in comparison

17  with other attributes is not disclosed,[4] but a reasonable person would understand that two people

18  looking at the same underlying data could come up with vastly different ratings depending on

19  their subjective views of what is relevant and what is important." *Id.*

20      Paragraph 68 of the complaint alleges that the "relative MQ placement of ZL versus

21  Symantec gives a clear message that ZL's offerings are significantly inferior to Symantec's."

22  Again, ZL does not allege that Gartner ever stated that ZL's offerings are significantly inferior to

23  Symantec's products, only that an inference to that effect might be drawn by a consumer. In fact,

24  the actual statements in the MQ Report are inconsistent with ZL's allegation. *See* Complaint ¶

25

26      [4] In fact, Gartner is more transparent in its evaluative technique than the defendant in

27  *Brown v. Avvo*. There, defendant did not reveal how an attribute was weighed in comparison to
another, while Gartner indicates the relative importance of the criteria with a weight of low,

28  standard, or high. RJN Ex. A at 5-6, Ex. B at 6-7, Ex. C at 6-7.

13

74 (acknowledging that Gartner recognized ZL's products for "great product performance as well as good prices and consistent support"); *see also* RJN Ex. C at 17 (recognizing that ZL's "partitioned search supports fast access to data in very large archive repositories" and that ZL "has large deployments with customers that are happy with product features, scalability and efficient use of infrastructure resources."); *see also* RJN Ex. B at 8 (noting that "references spoke of the solution's ease of deployment, strong performance, and comprehensive supervision and discovery modules" and recognizing that ZL had "begun to get some market traction with stronger and larger references, and a good win as the OEM partner for Oracle's entry into the archiving market").

ZL alleges that its designation as a Niche Player "is impossible to reconcile" when its product performance review is so positive, but it also acknowledges that it did not score well in "Product/Offering Strategy...Geographic Strategy...Marketing Execution, and Sales." Complaint ¶ 74. ZL's inability to reconcile its positive performance review with its designation as a Niche Player simply reflects the reality that an MQ rating is not a fact that can be proved true or false. Rather, as concluded above, the rating reflects Gartner's opinion based on its review of multiple criteria and its application of relative weights to what it considers important to a vendor's "Ability to Execute" and "Completeness of Vision."[5]  *See supra* III.B.1.A; *see also Partington*, 56 F.3d at 1158-59 (the fact that "reasonable minds can and do differ" as to the appropriate conclusions to be drawn from a given set of circumstances is not evidence that the conclusion is provably false, but instead a clear sign that the conclusion constitutes constitutionally protected opinion); *Browne*, 525 F.Supp.2d at 1253.

The other Alleged Defamatory Statements also are opinions.  Gartner's statement that, "ZL is primarily a product and engineering-focused company.  To remain [a] viable vendor in the

---

[5]  ZL contends that inclusion of some qualitative evaluation in the MQ Reports does not alter the inherently factual nature of the Reports' conclusions and that qualitative analysis is not necessarily non-factual opinion.  While it is true that qualitative analysis is not necessarily non-factual, Gartner's relative weighing of the criteria upon which MQ status is based is a purely subjective determination that cannot be proved true or false and upon which reasonable persons can disagree. *Partington*, 56 F.3d at 1158-59.

14

1    market, the company must gain greater visibility and more aggressively expand its sales

2    channels," Complaint ¶ 33, clearly cannot be proved true or false.  The same is true of the

3    statement that ZL "must gain greater visibility and more aggressively expand its sales channels"

4    to remain a viable vendor.  *See Compuware Corp. v. Moody's Investors Servs., Inc.*, 499 F.3d

5    520, 529 (6th Cir. 2007) (holding a credit rating agency's negative rating of plaintiff based on a

6    pessimistic assessment of plaintiff's future prospects to be non-actionable "predictive opinion.")

7    Nor does ZL explain how Ms. DiCenzo's alleged statement that the ZL Products and Symantec's

8    Enterprise Vault (EV) "were the same," Complaint ¶ 34, is defamatory given Symantec's

9    prestigious rating as a "Leader."  It also is unclear how the statement could be understood as

10   anything other than non-actionable opinion.

11        ZL contends that even if the Court determines that Gartner's statements properly are

12   viewed as opinion, Gartner still may be held liable for statements of opinion that imply the

13   existence of additional, undisclosed facts.  Opp. MTD at 13, citing *Milkovich v. Lorain Journal*

14   *Co.*, 497 U.S. 1, 18 (1990); *see also* Opp. MTD at 14, citing *Unelko*, 912 F.2d at 1055

15   (concluding that defendant Andy Rooney's opinion that a wind-shield treatment product "didn't

16   work" implied additional or undisclosed facts capable of being proven true or false, including

17   that "rain did not disperse on contact" and "that it did not repel bugs and other projectiles.").

18   However, the Alleged Defamatory Statements in the instant action do not contain *implied*

19   undisclosed facts capable of being proved true or false.  As is evident from the MQ Report itself,

20   a company's MQ rating reflects Gartner's opinion as to whether the company is a Leader,

21   Visionary, Challenger, or Niche Player.  Gartner makes this determination by looking to a

22   number of factors, applying differing weights based on its opinion regarding a company's ability

23   to execute and completeness of vision.  Unlike the facts implied by the opinions in *Unelko*, the

24   weight applied to these criteria is not a fact that can be proved true or false but is a reflection of a

25   subjective valuation by Gartner.[6]

26   _____

27        [6] ZL alleges in great detail how its product's performance is superior to that of
     Symantec's comparable product.  Complaint ¶¶ 7, 41-67 (detailing ZL's superior software,
28   including but not limited to, its ability to:  out-perform Symantec by over a thousand-fold in

15

1        **2. California Business and Professions Code Claims**

2        ZL's third and fourth claims for relief allege violations of the Unfair Competition Law

3   ("UCL"), Cal. Bus. & Prof. Code § 17200, et seq., and the California False Advertising Law

4   ("FAL"), Cal. Bus. & Prof. Code § 17500.  Gartner argues that ZL lacks standing to bring either

5   claim because ZL fails to plead facts alleging that Gartner benefitted from ZL's lost profits or

6   that ZL was injured by actual reliance on Gartner's actions.  The UCL prohibits "any unlawful,

7   unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading

8   advertising." Cal. Bus. & Prof. Code § 17200.  In order to assert a claim under the UCL, a person

9   must have "suffered injury in fact and ha[ve] lost money or property as a result of such unfair

10  competition." *Rondberg v. McCoy*, 2009 WL 3017611, at *5 (S.D. Cal. Sept. 21, 2009), citing

11  Cal. Bus. & Prof. Code §§ 17204 & 17535.  Gartner also contends that ZL fails to state a FAL

12  claim because Gartner's claims of expertise do not constitute "advertising."

13                      **A. Loss of Property**

14       The "UCL 'provides only limited remedies:  restitution and injunctive relief...To obtain

15  monetary recovery under UCL 'the plaintiff must once have had an ownership interest in the

16  money or property acquired by the defendant through unlawful means.'" *Fulford v. Logitech,*

17  *Inc.*, 2008 WL 4914416 at *3 (N.D. Cal. Nov. 14, 2008), citing *Shersher v. Superior Court*, 154

18  Cal.App.4th 1491, 1500 (2007).  The same is true as to ZL's FAL claim. *Fulford,* 2008 WL

19  4914416 at *3, citing *Buckland v. Threshold Enters., Ltd.,* 155 Cal.App.4th 798, 819, 66

20  Cal.Rptr.3d 543 (2007) ("[L]ike the UCL, remedies for individuals under the FAL are limited to

21  restitution and injunctive relief ...."). Gartner argues that because ZL fails to allege that Gartner

22  ever acquired money or property from ZL, ZL cannot state a claim entitling it to restitution.  ZL

23  contends that this interpretation of the standard for restitution is too narrow.  Opp. MTD at 21-

24  _____

25  search speed of enterprise-wide searches; search with more accuracy than Symantec; scale to one
    to two orders of magnitude above Symantec in any given vault; and reduce the cost of servers,

26  storage and administrative overhead to half that of Symantec).  While these individual
    characteristics of ZL's product are capable of being proved true or false, the MQ Report nowhere

27  suggests that ZL's products do not possess these qualities.  To the contrary, the MQ  Report
    explicitly credits ZL's positive product quality, while at the same time cautioning that to remain

28  viable in the market the company needs to invest more in marketing. RJN Ex. C at 17.

Case Number CV 09-02393 JF (RS)
ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND IN PART
(JFLC1)

1    22, quoting *Shersher*, 154 Cal.App.4th at 1494 ("Nothing in *Korea Supply* conditions the

2    recovery of restitution on the plaintiff having made direct payments to a defendant who is alleged

3    to have engaged in false advertising or unlawful practices under the UCL.")  However, while the

4    court in *Shersher* did conclude that direct payment from plaintiff to defendant is not necessary to

5    state a claim of false advertising or unlawful practices under the UCL, California still requires

6    that the defendant have benefitted from the actions that resulted in an economic loss to plaintiff.

7    *Shersher*, 154 Cal.App.4th at 1499-1500 (finding that defendant Microsoft still benefitted from

8    plaintiff's purchase of Microsoft products from third party dealers despite the fact that the

9    moneys were not paid directly from plaintiff to defendant).  Gartner points out correctly that ZL

10   "has failed to allege that the money [it lost]...is now, or ever was, in the possession of" Gartner.

11   *Fulford,* 2008 WL 4914416 at *3.

12                                         **B. Reliance**

13          When making a claim under the "fraud prong" of the UCL, a plaintiff must demonstrate

14   with specificity that a defendant's alleged misrepresentations: 1) were relied upon by the

15   plaintiffs; 2) were material; 3) influenced the plaintiff's decision that caused their injury; and 4)

16   were likely to deceive members of the public.  *In re Tobacco II Cases*, 46 Cal.4th 298, 326-28

17   (2009).  Gartner argues that ZL lacks standing to bring a UCL claim sounding in fraud because

18   ZL alleges not its own reliance upon the Alleged Defamatory Statements but that of third parties

19   – potential ZL customers – resulting in a loss of profits and injury to ZL.  ZL contends that

20   standing under sections 17500 and 17200 requires only a demonstration that a defendant's

21   misrepresentations caused injury to the plaintiff.  Opp. MTD at 22.  However, ZL fails to cite any

22   case law holding that a plaintiff that itself did not actually rely upon the alleged

23   misrepresentations is entitled to relief under these statutes.  *See* Opp. MTD at 22.  The only

24   authority ZL does cite – *Medina v. Safe-Guard Prods.*, 164 Cal.App.4th 105, 115 (2008) –

25   involved a plaintiff who did in fact allege such reliance.  *See Rondberg,* 2009 WL 3017611 at *5;

26   *see also Laster v. T-Mobile USA, Inc.*, 407 F.Supp.2d 1181, 1194 (S.D. Cal. 2005) (holding that

27   "because Plaintiffs fail to allege *they* actually relied on false or misleading advertisements, they

28   fail to adequately allege causation as required by Proposition 64. Thus, under §§ 17203 and

17

17204, Plaintiffs lack standing to bring their UCL and FAL claims.")

## C. Advertising

In determining whether representations constitute advertising under section 17500, California courts look to the speaker, the intended audience, and the content of the message. *Kasky v. Nike*, 27 Cal.4th 939, 960 (2002). Essentially, the question of whether MQ Reports are advertising turns upon whether the content of the message constitutes commercial speech. The content of a message that constitutes commercial speech "typically means that the speech consists of representations of fact about the business operations, products, or services of the speaker (or the individual or company that the speaker represents), made for the purpose of promoting sales of, or other commercial transactions in, the speaker's products or services." *Id.* at 961. ZL argues that "the content of the message is indubitably commercial—indeed, the entire focus of the reports." Opp. MTD at 23. This argument is unpersuasive. The statements in the MQ Report at issue here are not "representations of fact about the business operations, products or services of the speaker," but rather Gartner's views and opinions about the products of IT vendors, including ZL. *Kasky*, 27 Cal. 4th at 961.

### 3. Negligent interference with prospective economic advantage

"Where a special relationship exists between the parties, a plaintiff may recover for loss of expected economic advantage through the negligent performance of a contract although the parties were not in contractual privity." *J'Aire Corp. v. Gregory*, 24 Cal.3d 799, 804 (1979) (citations omitted). Gartner contends, and ZL concedes, that virtually every reported case in which a special relationship has been found concerns a third-party beneficiary to a contract. ZL nonetheless argues that the *J'Aire* factors support the existence of a special relationship, and thus a duty, between itself and Gartner. These factors include: "(1) the extent to which the transaction was intended to affect the plaintiff; (2) the foreseeability of harm to the plaintiff; (3) the degree of certainty that the plaintiff suffered injury; (4) the closeness of the connection between the defendant's conduct and the injury suffered; (5) the moral blame attached to the defendant's conduct; and (6) the policy of preventing future harm. In connection with the last

18

factor, countervailing public policies which may preclude recovery must also be considered."

*Worldvision Enterprises, Inc. v. American Broadcasting Companies,* 142 Cal.App.3d 589, 596

(Cal. Ct. App. 1983), citing *J'Aire Corp.,* 24 Cal.3d at 804, 804 n. 1.

ZL claims that Gartner singled out ZL for a low ranking in the MQ Report, was "aware of the harm" caused by its actions, and knew that it had a large customer base that would consider its opinions in selecting an email archiving product.  Opp. to MTD at 24, citing Complaint ¶¶ 74-77, 86.  However, the complaint contains no facts that would support a conclusion that there is any moral blame attached to Gartner's conduct, and ZL offers no persuasive argument that countervailing public policy should not preclude the finding of a duty.  To the contrary, Gartner's First Amendment right to express an opinion is entitled to great weight.

In *Worldvision Enterprises, Inc. v. American Broadcasting Companies,* 142 Cal.App.3d 589 (Cal. Ct. App. 1983), the defendant, an ABC officer, made negative remarks regarding the violence contained in a television program in which plaintiff owned residual syndication rights. The court concluded that "even assuming a sufficiently close connection between defendant's statements and plaintiff's injury and that the harm to plaintiff was foreseeable, the other factors compel a conclusion that defendant owed no duty toward plaintiff." *Id.* at 596.  The court observed that "all defendant did in this case was to voice an opinion...on an issue of significant public interest...to defendant's network affiliates, who bore a special relationship to defendant and who had an interest in knowing defendant's broadcasting philosophy and the reasons for defendant's scheduling decisions." *Id.*  Similarly here, the Alleged Defamatory Statements are an expression of Gartner's opinion regarding various IT companies' email archiving products relative to their "Ability to Execute" and "Completeness of Vision."  These opinions, while not about a matter of public concern, are shared with Gartner's corporate customers, who specifically seek out and thus have a particular interest in Gartner's opinions.

### C. Leave to Amend

Leave to amend should be granted unless it is clear that the complaint's deficiencies cannot be cured by amendment.  *Lucas v. Dep't of Corr.*, 66 F.3d 245, 248 (9th Cir. 1995).

1   When amendment would be futile, dismissal may be ordered with prejudice. *Dumas v. Kipp*, 90

2   F.3d 386, 393 (9th Cir. 1996).  ZL contends that through its "continuing investigation" it has

3   discovered facts that lend further support to the allegations in the complaint.  Opp. MTD at 25, n.

4   7.  In particular, ZL claims that "a former board member of Gartner was also, until very recently,

5   a board member of Symantec, and also...a co-founder of a significant Gartner shareholder" that

6   according to a recent SEC filing by Gartner "'may be able to exercise significant influence over

7   matters' of significant importance at Gartner." *Id.*  ZL also purports to have discovered that

8   Gartner maintains business relationships with at least some of the IT companies that it rates in its

9   MQ Report, "some of whom pay Gartner hundreds of thousands of dollars per year for Gartner

10  services, promotion, and participation in Gartner trade shows." *Id.*

11      Gartner urges the Court not to consider these allegations for two reasons: (1) the alleged

12  new facts are inconsistent with the allegations in the complaint that ZL's MQ rating resulted

13  from "misguided analytical models" and "favor[ing] of larger companies," Gartner Reply at 14-

14  15, n. 5; *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986)

15  (concluding that leave to amend should not be allowed only if "the allegation of other facts

16  consistent with the challenged pleading could not possibly cure the deficiency");  and (2) the

17  Alleged Defamatory Statements that form the basis of all of ZL's claims still are non-factual

18  statements of opinion protected by the First Amendment, and nothing that ZL reasonably could

19  allege in the future could transform such opinions into actionable statements of fact.  Gartner

20  Reply at 15.

21      The Court is not entirely persuaded as to the first point:  proof of bias is not necessarily

22  inconsistent with proof of a flawed methodology and arguably even could be an explanation for

23  it.  Indeed, ZL seems to suggest in its opposition papers, at this point without any factual

24  allegations in its complaint, that the MQ rankings are not really rankings at all but instead are

25  disguised endorsements of companies with which Gartner has a close economic relationship.

26  The second point presents a much closer question.  As discussed at length above, the Court

27  concludes that the Alleged Defamatory Statements as such are non-actionable statements of

28  opinion, and obviously no amendment can change the statements themselves.  Other courts have

20

denied leave to amend under similar circumstances, concluding that amendment would be futile. *Partington*, 56 F.3d at 1162 (affirming the district court's dismissal without leave to amend of defamation and false light claims when the alleged defamatory statements were held to be non-actionable opinions protected by the First Amendment); *Browne*, 525 F.Supp.2d at 1255 (dismissing plaintiff's claims of defamation and libel without leave to amend after concluding that defendant's evaluative rankings were non-actionable opinions protected by the First Amendment).  Because the statements are at the core of all of ZL's claims, it appears very unlikely that even additional allegations of bias will enable ZL to state a viable claim, particularly given the fact that even under the liberal pleading standard of Fed. R. Civ. P. 8(a) a claim must be "plausible on its face," *Twombly*, 550 U.S. at 570 (2007)*, see also Iqbal v. Aschroft*, __ U.S. __, 129 S.Ct. 1937, 1950-53 (2009), and in light of the constraints imposed by Fed. R. Civ. P. 11.  However, in keeping with the strong policy in the Ninth Circuit favoring amendment, leave to amend in part will be granted here.[7]

### IV. ORDER

Good cause therefor appearing, the motion to dismiss is GRANTED, with leave to amend in part as set forth herein.  Any amended complaint shall be filed within thirty (30) days of the date this order is filed.

**IT IS SO ORDERED.**

DATED: November 4, 2009

_____
JEREMY FOGEL
United States District Judge

---

[7]  Because the Court can discern no way in which additional factual allegations could cure the deficiencies in ZL's claims under the UCL or FAL or for negligent interference with prospective business advantage, leave to amend will be denied as to these claims.

1   This Order has been served upon the following persons:

2

3   James Matthew Wagstaffe     wagstaffe@kerrwagstaffe.com, milla@kerrwagstaffe.com

4   Justin B. Barnard     justinbarnard@quinnemanuel.com

5   Michael Kai Ng     mng@kerrwagstaffe.com, hanna@kerrwagstaffe.com,
6   murphy@kerrwagstaffe.com

7   Perry J. Narancic     pnarancic@nk-pc.com

8

9   Robert P. Feldman     bobfeldman@quinnemanuel.com, elainechao@quinnemanuel.com,
    rachelarteaga@quinnemanuel.com

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case Number CV 09-02393 JF (RS)
ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND IN PART
(JFLC1)