DESIGNATED FOR PUBLICATION

**E-Filed 5/3/2010**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| ZL TECHNOLOGIES, INC., | Case Number CV 09-02393 JF (PVT) |
| Plaintiff, | ORDER GRANTING MOTION TO DISMISS |
| v. | [re: docket no. 38] |
| GARTNER, INC. and CAROLYN DiCENZO, | |
| Defendants. | |

## I. BACKGROUND

**1.     Procedural Background**

Plaintiff ZL Technologies, Inc. ("ZL") filed its original complaint against Defendants Gartner, Inc. and Carolyn DiCenzo (collectively, "Gartner") on May 29, 2009, alleging seven claims for relief: (1) defamation of character; (2) trade libel; (3) false statements under § 43(a) of

1

the Lanham Act concerning Gartner's products and services; (4) false statements under § 43(a) of

the Lanham Act concerning products of Symantec Corporation ("Symantec"); (5) false or

misleading advertising under California Business and Professions Code § 17500; (6) unfair

competition under California Business and Professions Code § 17200; and (7) negligent

interference with prospective economic advantage. Gartner moved to dismiss for failure to state a

claim upon which relief may be granted pursuant to Rule 12(b)(6).  On October 23, 2009, the

Court granted Gartner's motion in its entirety, with leave to amend except as to ZL's claims

under the California Business and Professions Code and for negligent interference with

prospective business advantage.

On December 4, 2009, ZL filed its first amended complaint ("FAC") alleging claims for

defamation of character and trade libel.  Gartner again moves to dismiss.  The Court has

considered the moving and responding papers and the oral arguments of counsel presented at the

hearing on February 12, 2010.  For the reasons discussed below, the motion will be granted, this

time without leave to amend.

**2.      Factual Allegations of the FAC**

ZL alleges the following facts, which are presumed to be true for the purposes of a

motion to dismiss.

**A. The Parties**

ZL "makes and sells enterprise software, including cutting-edge systems that allow large

enterprises to store, index, search, and extract electronic data, primarily email and files."  FAC ¶

8.  ZL is primarily self-funded and has avoided seeking large amounts of venture capital funding

2

Case Number CV 09-02393 JF (PVT)
ORDER GRANTING MOTION TO DISMISS
(JFLC1)

in order to retain its independence and make business decisions for the long-term benefit of its enterprise customers. *Id.* ¶ 11. ZL "offers the strongest products with the broadest capabilities in the email archiving market," *id.* ¶ 12, and its superior products and service earned the company a core of customers that include some of the world's largest enterprises. *Id.* ¶ 15. However, ZL's sales trail significantly those of its larger competitors, including Symantec. *Id.* ¶ 16.

Gartner, which identifies itself as "the world's leading information technology research and advisory company," provides analysis of the information technology industry to paying corporate and executive customers. *Id.* ¶ 17. According to ZL, the large enterprises and governmental bodies that tend to purchase emailing archive software "rely heavily on outside advice," and "Gartner dominates the market for providing such advice." *Id.* ¶ 18. Gartner's market position gives it the ability to exercise "make-or-break power over the technology providers whose products are aimed at such purchasers." *Id.* ¶ 19. Gartner touts its own influence, asserting in marketing materials that "Gartner is not just bigger, more networked, or more influential than the competition. We are in a league of our own...We can show you how to buy, what to buy, and how to get the best return on your technology investment." *Id.* ¶ 20. Others in the industry recognize Gartner's dominance as well. An unspecified published article asserted that "[f]ailure to get a favorable mention in an analyst report could undermine years of product development. Acceptance, on the other hand, boosts a company's exposure and is essential for buyers drawing up shortlists." *Id.* ¶ 22.

DiCenzo is Gartner's lead analyst for the email active archiving market. *Id.* ¶ 4.

Case Number CV 09-02393 JF (PVT)
ORDER GRANTING MOTION TO DISMISS
(JFLC1)

### B.  Allegations of Wrongdoing

ZL's claims of defamation and trade libel are based entirely upon its ranking as a "Niche" player in Gartner's Magic Quadrant ("MQ") Report, *id.* ¶¶ 81-91, and a statement by DiCenzo that ZL's products and Symantec's Enterprise Vault software were "the same" (collectively, "Alleged Defamatory Statements"). *Id.* ¶¶ 97-102.

_____The annual MQ Report provides research analysis of particular market segments annually.  *Id.* ¶ 23.  The target audience for the MQ Report is the potential customer base for vendors analyzed in the report.  *Id.* ¶ 24.  Email archiving software has been analyzed in the MQ Report since 2002.  The MQ Report "for email archiving states that the report covers product vendors who were 'able to prove, through strong references, their ability to address the needs of an organization looking to support thousands of users.'"  *Id.* ¶ 25.

The MQ Report places IT vendors on a proprietary map called "the Magic Quadrant" that divides vendors into four quadrants in declining order of desirability:  "Leader," "Challenger," "Visionary," and "Niche."  *Id.* ¶ 26.  The axes of the four quadrants measure a vendor's "ability to execute" and "completeness of vision."  *Id.* ¶ 30.  The "ability to execute" variable is based upon Gartner's assessment of the vendor's quality of goods and services, overall viability, sales execution, market responsiveness and track record, marketing execution, customer experience, and operations.  *Id.* ¶ 31.  The "completeness of vision" axis reflects an evaluation of a vendor's market understanding, market strategy, sales strategy, product strategy, business model, industry strategy, innovation, and geographic strategy.  *Id.* ¶ 32. Each component is comprised of sub-components; for example, "'Quality of Goods and Services' is...broken out into such factors as

Case Number CV 09-02393 JF (PVT)
ORDER GRANTING MOTION TO DISMISS
(JFLC1)

'capabilities, quality, feature sets.'" *Id.* ¶ 33.  The components upon which placement along the axis is based are assigned weights – heavy, standard or low.  *Id.*

ZL amended its original complaint by adding allegations that collectively assert the following: (1) Gartner's placement of ZL on the Magic Quadrant is a "statement of fact"; (2) Gartner's MQ Reports are based on unpublished data and facts; and (3) Gartner's opinions are affected by an inherent bias because Gartner has an economic interest in selling its services to the companies it rates.

1. **Allegations that Magic Quadrant designation is a statement of fact**

ZL claims that "placement of a vendor, both within one of the four quadrants of a Magic Quadrant and relative to the vendor's competitors in the Magic Quadrant, is a statement of fact."  *Id.* ¶ 35.  It asserts that Gartner intends placement within the MQ Report to be understood as a statement of fact and that readers understand it to be the same.  *Id.* ¶ 36.  The FAC contains several specific allegations in support of this assertion.  First, it alleges that a Gartner vice president and analyst wrote on Gartner's website that placement in the Magic Quadrant is based on a "rigorous mathematical model."  *Id.* ¶ 38 (asserting that a Gartner vice president told a former employee that, "in your day, [MQ Reports] were developed by smart analysts placing dots.  Today, we have a much more rigorous mathematical model – we don't just place dots").  Second, it claims that Gartner "implicitly characterizes" the MQ Report designations as factual by allowing rated vendors to "respond to 'factual errors.'"  *Id.* ¶ 39.  Third, it points out that Gartner describes its research and analysis as "highly discerning research that is objective, defensible, and credible to help [customers] do [their] job better."  *Id.* ¶ 41.

5

Case Number CV 09-02393 JF (PVT)
ORDER GRANTING MOTION TO DISMISS
(JFLC1)

Fourth, it alleges that a Gartner research guide claims that "Gartner Research is built on objectivity" and that its research methodology promises the "ultimate objectivity." *Id.* ¶ 42. Finally, it cites a statement in Gartner's 2008 SEC 10-K that "Gartner consultants provide fact-based consulting services to help our clients use and manage IT to enable business performance, " *id.* ¶43, and that the Gartner website asserts "[w]e are fact-based and knowledge-centric." *Id.* ¶ 44.  At the same time, ZL alleges that "[i]n portions of Gartner's reports, it attempts to disclaim certain of its statements as opinion." *Id.* ¶ 58; *see also* Request for Judicial Notice In Support of Defendants' Motion to Dismiss Plaintiff's Complaint ("RJN"),[1] Ex. C (Magic Quadrant Report for 2009) at 1 (noting that "[t]he opinions expressed herein are subject to change without notice."), 3 (stating that placement of vendors on the Magic Quadrant "is based on Gartner's view of the vendor's performance").

### 2. Allegations of unpublished data underlying the Magic Quadrant Reports

ZL alleges that the MQ Report is based on undisclosed data and facts. FAC ¶¶ 45-67. The 2009 MQ Report states:

> Shaping Gartner's view regarding proper vendor placement are more than 1,000 conversations over the past year with Gartner customers, as part of our inquiry service, survey responses and updates from the vendors in the March/April 2009 time frame, and over 70 conversations with vendor-supplied references in March and April 2009.  We learn from these conversations not only why a client is choosing or has chosen a specific vendor, but why it did not choose other vendors that were on its shortlist.  We also learn about experiences running the product in production environments, and how effective the vendors are in responding to

---

[1]  The 2007, 2008, and 2009 Magic Quadrant Reports, of which the Court took judicial notice in its order dismissing ZL's initial complaint, remain a part of the record on the instant motion.

Case Number CV 09-02393 JF (PVT)
ORDER GRANTING MOTION TO DISMISS
(JFLC1)

client issues.  Increasingly, we are learning about why a company is choosing to replace an existing vendor with a new vendor solution.

*Id.* ¶ 46.  The following statement attributed to of Gartner's research director is found in a section of the company's website entitled, "How not to use a Magic Quadrant":

Also, an MQ...reflects only a tiny percentage of what an analyst actually knows about the vendor.  Its beauty is that it reduces a ton of quantified specific ratings (nearly 5 dozen, in the case of my upcoming MQ) to a point on a graph, and a pile of qualitative data to somewhere between six and ten one-or-two-sentence bullet points about a vendor.

*Id.* ¶ 47.  ZL asserts that while Gartner refers to the data underlying the MQ Report, it does not publish the data, and that Gartner's business model depends on the non-publication of this data.  *Id.*  ¶¶ 49-57 (explaining that while Gartner sells the MQ Reports, the more lucrative part of its business is the sale of the additional information and analysis, such as customized analyst reports, consulting time, inquires and other related services).

In addition, ZL insists that while Gartner "attempts to disclaim certain of its statements as opinion," *id.* ¶ 58, it "in fact create[s] the understanding that its opinions are to be construed as being based on undisclosed facts."  *Id.* ¶ 59.  ZL cites an example in a brochure published on Gartner's website entitled, "the Gartner Research Process and Methodologies."  *Id.* ¶ 60.  The brochure states that "Our opinions are grounded in a solid base of facts verified by our own experienced analysts and others in business and academia."  *Id.*  ZL provides several other examples of statements by Gartner to the effect that Gartner's insights and opinions are "grounded in a consistent methodology and fact-based analysis," "drawn from a critical fact base not available anywhere else," "based on facts as our analysts see them, without unfair or undue

7

Case Number CV 09-02393 JF (PVT)
ORDER GRANTING MOTION TO DISMISS
(JFLC1)

influence," "qualitative research is reinforced by quantitative research...no stone is left unturned," and "fact-based...and created by well-timed and delivered vendor briefings and other analyst interactions." *Id.* ¶¶ 61-66.  ZL alleges that these and other statements create an understanding that Gartner's research and analysis – "even that characterized as 'opinion,' 'insight' or 'qualitative' in nature – is based on verifiable fact." *Id.* ¶ 67.

### 3. Allegations of Gartner's inherent bias

ZL also alleges that Gartner's placement of vendors within the Magic Quadrant is inherently biased. *Id.* ¶ 80.  It claims that purchasing time with a Gartner analyst allows a vendor to obtain information that will help it to improve its rating. *Id.* ¶¶ 69-73, 77.  Vendors that fail to pay for time with a Gartner analyst are limited to providing information to Gartner in a "Vendor Briefing", "receiv[ing] no indication of the analyst's perspectives." *Id.* ¶ 73.  A vendor that chooses to pay for analyst time "is better able to understand the views of an analyst covering that vendor, and better able to tailor its presentation to obtain a favorable review." *Id.* ¶ 77.  To obtain the information necessary to improve their rating, vendors, including ZL, have entered into contracts with Gartner for analyst time. *Id.* ¶ 70-71 ("Vendors, for example, pay $25,000 or more for a basic annual Gartner subscription in order to obtain time with analysts covering the vendor's market.").  Gartner states explicitly that its Completeness of Vision standard is based on whether the "vendor's view of how the market will develop matches Gartner's perspective." *Id.* ¶ 69.

ZL alleges further that Gartner has a direct economic interest in rating favorably vendors that pay for Gartner's consulting and analyst services. *Id.* ¶¶ 74-80.  It claims that "[w]hen

Case Number CV 09-02393 JF (PVT)
ORDER GRANTING MOTION TO DISMISS
(JFLC1)

Gartner expresses a favorable opinion of a particular vendor that has paid the company substantial fees (or from which it hopes to obtain such fees) Gartner is not performing an independent analysis, but making a self-interested statement about a business partner." *Id.* ¶ 80.

### C. The Alleged Defamatory Statements

#### 1. Placement in the Magic Quadrant

Since 2005, Gartner has identified ZL annually as a "Niche Player." *Id.* ¶ 81. ZL alleges that this is the lowest possible placement and that a reader would understand such placement to indicate that ZL "is unfocused and does not outinnovate or outperform others." *Id.* ¶¶ 81, 83. Gartner allegedly "defines a 'Niche Player' as either having that meaning or indicating that the vendor 'operates successfully in a small segment.' Readers of the [MQ Report], especially ZL's potential customers, would understand that Gartner's placement of ZL in the 'Niche Player' quadrant did not indicate that ZL 'operates successfully in a small segment...Therefore, Gartner's placement of ZL in the 'Niche Players' quadrant is defamatory because it was intended to be, and in fact was, understood by the readers of the [MQ Reports] to indicate that ZL 'is unfocused and does not outperform others.'" *Id.* ¶¶ 84-85. ZL also claims that its placement in the "Niche Players" category is defamatory because a reader would interpret such designation as indicating that ZL does not "[e]xecute[] well today," is not "well-positioned for tomorrow," and "may be a risky choice." *Id.* ¶¶ 86-89.

ZL alleges that it was placed in a "significantly inferior position, both with respect to the Ability to Execute axis and the Completeness of Vision axis, with respect to Symantec, which is one of its chief competitors. In each of those MQ Reports, Symantec was placed in the 'Leaders'

9

Case Number CV 09-02393 JF (PVT)
ORDER GRANTING MOTION TO DISMISS
(JFLC1)

quadrant; in all but one year, Symantec was the only 'Leader.'" *Id.* ¶ 82.  ZL claims that all of

these statements are false because ZL's products and service objectively are superior to those of

its competitors. *Id.* ¶ 94 (indicating that ZL outperforms Symantec specifically in the following

verifiable categories: search accuracy, search speed, and completeness of search).  ZL alleges that

because its own product is verifiably superior, Gartner's ranking of ZL as a Niche Player in its

MQ Report implies falsely that Symantec's products, service, and future products are superior.

*Id.* ¶ 90.

### 2. "The Same"

DiCenzo allegedly said to a group of potential ZL customers and business partners that

ZL's products were "the same" as Symantec's Enterprise Vault.  *Id.* ¶ 98.  ZL claims that this

statement was defamatory because it was "meant [to be and was] understood by those who heard

the statements to mean that ZL's products and Symantec's Enterprise Vault were identical with

respect to features, performance, value and quality."  *Id.* ¶ 99.  ZL also claims that DiCenzo knew

of the superiority of ZL's products when she made the statement and knew that such a statement

would "cripple ZL's chances of winning since the enterprise buyer would likely choose a large

versus small vendor of the 'same' product." *Id.* ¶ 102.

### D. Alleged impact of Gartner's statements

ZL alleges that Gartner's statements directly and proximately harmed both its business

and its reputation.  *Id.* ¶ 103.  ZL claims that some potential customers have refused to consider

its products at all, while others have begun discussions with ZL only to terminate negotiations

when they became aware of Gartner's statements.  *Id.* ¶ 104.  ZL alleges that the impact of the

10

MQ Report is so well known that the refusal of customers to consider any vendor not deemed a 'Leader' sometimes is referred to as being "Gartnered." *Id.* ¶ 105.

## II. LEGAL STANDARD

A complaint may be dismissed for failure to state a claim upon which relief may be granted if a plaintiff fails to proffer "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Allegations of material fact must be taken as true and construed in the light most favorable to the nonmoving party.  *Pareto v. FDIC*, 139 F.3d 696, 699 (9th Cir. 1998), *see also Cahill v. Liberty Mut. Ins. Co.,* 80 F.3d 336, 337-38 (9th Cir. 1997).  However, the Court need not accept as true allegations that are conclusory, unwarranted deductions of fact, or unreasonable inferences.  *See Sprewell v. Golden State Warriors,* 266 F.3d 979, 988 (9th Cir. 2001); *see also Twombly*, 550 U.S. at 561 ("a wholly conclusory statement of [a] claim" will not survive motion to dismiss).  Leave to amend should be granted unless it is clear that the complaint's deficiencies cannot be cured by amendment. *Lucas v. Dep't of Corr.*, 66 F. 3d 245, 248 (9th Cir. 1995).  When amendment would be futile, dismissal may be ordered with prejudice.  *Dumas v. Kipp*, 90 F.3d 386, 393 (9th Cir. 1996).

## III. DISCUSSION

The determinative question in this case is whether the Alleged Defamatory Statements are "reasonably capable of sustaining a defamatory meaning." *Knievel v. ESPN*, 393 F.3d 1068, 1073-74 (9th Cir. 2005), quoting *Cochran v. NYP Holdings, Inc.,* 58 F.Supp.2d 1113, 1121 (C.D. Cal. 1998), *aff'd and reasoning adopted*, 1074 210 F.3d 1036, 1038 (9th Cir. 2000)**.**  ZL's claims for defamation of character and trade libel are dependent upon a conclusion that the Alleged

11

Defamatory Statements properly may be characterized as false or misleading statements of fact. An expression of pure opinion is protected by the First Amendment and may not form the basis for a civil lawsuit. *Jensen v. Hewlett-Packard Co.*, 14 Cal.App.4th 958, 970 (Cal. Ct. App. 1993) (holding that an opinion cannot form the basis of a defamation claim); *ComputerXpress, Inc. v. Jackson*, 93 Cal.App.4th 993, 1010-11 (Cal. Ct. App. 2001) (determining that an opinion cannot form the basis of a trade libel claim).

This Court concluded previously that the Alleged Defamatory Statements asserted in ZL's original complaint were non-actionable opinions. The Court now concludes that the additional facts alleged in the FAC are insufficient to transform these opinions into assertions of fact.

**A. The Alleged Defamatory Statements**

Even on a motion to dismiss, the Court need not accept as true Plaintiff's allegation that placement within the Niche Player quadrant of the MQ Report is a statement of fact. Whether a statement constitutes a defamatory assertion of fact or a protected statement of opinion is a question of law for the Court to decide. *Kneivel*, 393 F.3d at 1073-74. The Ninth Circuit employs a three-part test in determining whether alleged defamatory statements are opinions or assertions of fact: "(1) whether the general tenor of the entire work negates the impression that the defendant [is] asserting an objective fact, (2) whether the defendant used figurative or hyperbolic language that negates that impression, and (3) whether the statement in question is susceptible of being proved true or false." *Partington v. Bugliosi*, 56 F.3d 1147, 1153-60 (9th Cir. 1995), citing *Unelko Corp. v. Rooney*, 912 F.2d 1049, 1053 (9th Cir. 1990), *cert. denied,* 499 U.S. 961, 111 S.Ct. 1586, 113 L.Ed.2d 650 (1991); *see also Gardner v. Martino,* 563 F.3d 981,

12

987 (9th Cir. 2009), citing *Knievel v. ESPN*, 393 F.3d 1068, 1075 (9th Cir. 2005) ("noting the three parts for the 'totality of the circumstances' test as (1) the broad context; (2) the specific context and the content of the statement; and (3) whether the statement is sufficiently factual to be susceptible of being proved true or false.")

### 1. DiCenzo's Statement

ZL contends that DiCenzo's statement that ZL and Symantec's products are "the same" is defamatory because it implies that ZL's features, performance, value and quality are no better than the objectively inferior products of Symantec.  Applying the *Partington* factors, ZL argues that: (1) the context of the statements was a session with potential ZL customers, the type of "fact-based consulting," in which Gartner says its analysts report what they "actually know about the vendor" and "explain the most recent findings specific to your business," *id.* ¶ 53; (2) nothing in the statement suggests hyperbole or figurative speech; and (3) the statement is susceptible to being proved true or false – either the products are the same or they are not.

The Court concludes that the statement is too general to support such a conclusion.  Even assuming that the products are not identical in performance, DiCenzo could have intended to imply that the products serve the same function, share compatibility with the same hardware, or are equally user-friendly.  As the Court concluded in its previous order, it is unclear how DiCenzo's assertion that the products "were the same" could be anything other than non-actionable opinion.[2]

---

[2]  Even if DiCenzo's statement were construed as an assertion of fact, ZL fails to demonstrate how the statement could be interpreted as defamatory given Symantec's alleged

Case Number CV 09-02393 JF (PVT)
ORDER GRANTING MOTION TO DISMISS
(JFLC1)

### 2.  The Magic Quadrant Ratings

The Court concluded previously that ZL's ranking in the "Niche Player" category of the Magic Quadrant was a non-actionable opinion.  In reaching this conclusion, the Court considered the MQ Reports themselves, which properly were the subject of judicial notice.  Although the FAC introduces a number of new factual allegations, these newly asserted facts do not change the essential nature of the Reports.

The cover page of the email archiving review states specifically that, "The *opinions expressed herein are subject to change without notice.*"  Gartner's Request for Judicial Notice ("RJN"), Exs. A (2007 MQ Report) at 1, B (2008 MQ Report) at 1, C (2009 MQ Report) at 1 (emphasis supplied).  ZL contends that the "presence of alleged disclaimers" does not compel dismissal, as any defamatory claim conceivably could be negated by the presence of a "footnote." Opp. Mot. at 18, citing *Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, 651 F.Supp.2d 155, 176 (S.D.N.Y. 2009) (citation omitted) (holding that defendant rating agency's ratings were non-actionable opinions because an opinion still may be actionable if the speaker does not genuinely and reasonably believe it or if it is without basis in fact).  In the present case, however, it is evident that the disclaimer does contribute to a "general tenor of the entire work [that] negates the impression that [Gartner] was asserting an objective fact." *See Partington,* 56 F.3d at 1153, *see also id.* at 1155 (advising in the context of a defamation suit that

---

superior and prestigious rating as a "Leader."  While ZL asserts that Symantec's product performance is inferior to that of ZL's products, the comparison *by Gartner* reasonably could be perceived only as positive given that Symantec's product consistently has been ranked in the MQ Report's highest rated quadrant.  FAC ¶ 82.

Case Number CV 09-02393 JF (PVT)
ORDER GRANTING MOTION TO DISMISS
(JFLC1)

"authors...must attempt to avoid creating the impression that they are asserting objective facts rather than merely stating subjective opinions").

In addition, the MQ Report explicitly reflects Gartner's "view" with respect to "proper vendor placement," and states specifically that it is based on "more than 1,000 conversations over the past year with Gartner customers, as part of [its] inquiry service, survey responses and updates from the vendors in the March/April 2009 time frame, and over 70 conversations with vendor-supplied references in March and April 2009."  RJN, Ex. C at 2-3.  Gartner unambiguously presents the MQ results as a reflection of its subjective "views" or "opinions," not as objective fact.  Gartner also identifies the bases of its opinion:  not product performance testing, but conversations with customers and vendor-supplied references, as well as surveys completed by vendors.

The "views" Gartner develops from its conversations and surveys are presented in the MQ Report along two axes.  The criteria upon which vendors are rated – "ability to execute" and "completeness of vision" – "contribute[] to the general tenor of the ranking being subjective." *Browne v. Avvo Inc.* 525 F.Supp.2d 1249, 1252 (W.D. Wash. 2007) (noting that defendant's use of "fuzzy descriptive phrases like 'superb,' 'good,' and 'strong'" in ranking attorneys on its website contributed to the general tenor of the rankings being subjective and concluding that "a reasonable reader would understand that these phrases and their application to a particular attorney are subjective.")  Gartner defines these criteria in the text of the MQ Report.  *See* FAC ¶ 31 (identifying the "Ability to Execute" criteria as quality of goods and services, overall viability, sales execution, market responsiveness and track record, marketing execution, customer

15

experience, and operations); *id.* ¶32 (identifying the "Completeness of Vision" criteria as market

understanding, market strategy, sales strategy, product strategy, business model, industry

strategy, innovation, and geographic strategy).  Each of these assessments is attributed explicitly

to conversations with customers, vendor surveys, and conversations with vendor-supplied

references.

ZL makes much of the statement of Gartner's vice president that placement of vendors on

the Magic Quadrant is based on a "rigorous mathematical model," *id.* ¶ 38, and Gartner's broader

statements about the nature of its analysis being "fact-based and knowledge-centric," "built on

objectivity," and founded on a methodology it says ensures the "ultimate objectivity."  *Id.* ¶¶

41–42, 44.  However, these statements are insufficient to transform the tenor of the rankings in

the MQ Report from opinion to fact.

Most opinions are based at least in part on facts.  That Gartner considered facts in

forming its opinions does not mean that the opinions are objectively verifiable.  Based upon the

relative value that it assigns to different criteria, Gartner weighs the importance of certain facts

differently.  The weight it applies to these facts is not verifiable, as it is reflective of Gartner's

subjective assessment of what is important in achieving an ability to execute and a completeness

of vision.  In *Aviation Charter, Inc. v. Aviation Research Group/US*, 416 F.3d 864, 870 (8th Cir.

2005), the Eighth Circuit noted that although the defendant's critique of the plaintiff "relies in

part on objectively verifiable data, the interpretation of those data was ultimately a subjective

assessment, not an objectively verifiable fact."  Similarly, in *Avvo,* the court held that while the

rating produced was based upon a *mathematical model's synthesis of objective facts* (in that

16

instance a lawyer's years of experience), "a reasonable person would understand that two people looking at the same underlying data could come up with vastly different ratings depending on their *subjective views* of what is relevant and what is important." *Avvo*, 525 F.Supp.2d at 1552 (emphasis added) (holding that the court determination that the rating was protected opinion was "bolstered by the fact that the Avvo rating system is an abstraction").

The same is true with respect to Gartner's assertion that its placement of vendors on the Magic Quadrant is determined by a "rigorous mathematical model."  Gartner points out in its reply papers that it uses a model to produce a ranking of a vendor's "Ability to Execute" and "Completeness of Vision" by combining assessments of the vendor across fifteen different subjective criteria.  "The assessments of a vendor as to each criteria [sic] are, in turn, based on subjective responses from vendors and their references, not verifiable testing."  Reply at 4, fn. 2. The use of a rigorous mathematical model to generate a ranking of software companies based upon this subjective data does not transform Gartner's opinion into a statement of fact that can be proved or disproved.  Rather, the mathematical model reflects subjective assessments by Gartner that are not verifiable, provable facts.  Phrases such as "built on objectivity" or "ultimate objectivity" do not imply that ZL's ranking as a Niche Player can be proved true or false. Instead, the use of such terms reasonably represents Gartner's assertion that its rankings are arrived at by "independent and unprejudiced" methods.

Addressing *Partington's* second factor, ZL notes that the MQ Report lacks hyperbolic or figurative language.  This observation is true as far as it goes, but it does not end the inquiry with respect to the second part of the *Partington* test.  *Partington*, 56 F.3d at 1155-56 (examining the

17

specific context of the alleged defamatory statements beyond whether it is hyperbolic or jocular in nature).  The actual context of the ratings in the MQ Report is found in the axes upon which a given vendor is rated.  As discussed above, the axes are subjective on their face, and a given vendor's placement explicitly reflects Gartner's interpretation and opinion.  RJN Ex. C at 18-19.

ZL also contends that the reports themselves state that they contain factual statements as vendors are permitted to "respond to any factual errors prior to publication of the MQ Report." FAC ¶ 41.  However, the fact that vendors can respond to "factual errors" does not mean that *everything* in the MQ Report is factual.  The reports contain both assertions of fact and pure opinion.  For example, the 2009 MQ Report states that "ZL's product supports 'Exchange, Lotus Notes, Sun Java Message Server and Internet mail systems, and is being sold directly and through channel partners, including Oracle, which sells it under the name Oracle E-mail Service.'" MTD at 8, citing MQ Report for 2009 at 17.  This type of statement, if erroneous, could be subject to correction.  In contrast, ZL's ultimate designation as a Niche Player reflects Gartner's opinion and is not the proper subject of a complaint of factual error.

Finally, ZL alleges that "the placement of ZL in the lowest quadrant, together with Gartner's description of 'Niche Players' can be interpreted *only* as a statement that ZL 'is unfocused and does not outinnovate or outperform others.'" Opp. Mot. at 18.  ZL argues that such a statement is "an objective, factual standard – and furthermore [is] susceptible of being proved true or false" pursuant to the third *Partington* factor.  *Id.*  However, this interpretation cannot be found anywhere in the MQ Reports.  Rather, Gartner's description of the Niche Player rating indicates unambiguously that the designation may reflect any one of the following:

Case Number CV 09-02393 JF (PVT)
ORDER GRANTING MOTION TO DISMISS
(JFLC1)

Niche players are narrowly focused on an application, market or product mix, or they offer broad capabilities without the relative success of competitors in other quadrants.  Niche players may focus on a segment of the market and do it well, or they may simply have modest horizons and lower overall capabilities compared with competitors.  Others are simply too new to the market or have fallen behind and, although worth watching, they have not yet developed complete functionality or the ability to execute.  *The niche quadrant is the most interesting this year*, as there are both emerging vendors in this quadrant that truly address market niches and also vendors that should be leaders, but are still struggling to get the right mix of product and go-to-market activities.

MQ Report for 2009 at 8 (emphasis in original).  In fact, ZL's allegation that its status as a Niche Player only can be interpreted to suggest that it is "unfocused and does not outinnovate or outperform others" is belied by other statements in the MQ Reports.  RJN Ex. C at 17 (recognizing that ZL's "partitioned search supports fast access to data in very large archive repositories" and that ZL "has large deployments with customers that are happy with product features, scalability and efficient use of infrastructure resources."); *see also* RJN Ex. B at 8 (noting that "references spoke of the solution's ease of deployment, strong performance, and comprehensive supervision and discovery modules" and recognizing that ZL had "begun to get some market traction with stronger and larger references, and a good win as the OEM partner for Oracle's entry into the archiving market").

### B. Implied Statements of Fact

ZL next contends that if the Alleged Defamatory Statements themselves are opinions, they nonetheless are not entitled to First Amendment protection because they imply statements of fact.  ZL is correct that there is not a "wholesale defamation [or trade libel] exemption for anything that might be labeled 'opinion.'"  *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18, 110

19

S.Ct. 2695, 2705, 111 L.Ed.2d 1 (1990).  Such an exemption "would [] ignore the fact that

expressions of 'opinion' may often imply an assertion of objective fact."  *Id.*  Accordingly, "the

threshold question in defamation suits is not whether a statement might be labeled opinion, but

rather whether a reasonable factfinder could conclude that the statement implies an assertion of

objective fact."  *Unelko*, 912 F.2d at 1053 (citation and internal quotation marks omitted)

(concluding that defendant Andy Rooney's opinion that a wind-shield treatment product "didn't

work" implied additional or undisclosed facts capable of being proven true or false, including

that "rain did not disperse on contact" and "that it did not repel bugs and other projectiles."); *see

also Gill v. Hughes*, 227 Cal. App.3d 1299, 1309 (1991) (holding that "[t]he statement that

plaintiff 'is an incompetent surgeon and needs more training'...is susceptible of being proved true

or false.").

    However, while ZL accurately has stated the law, its argument misapplies both *Milkovich*

and *Unelko*.  The FAC and ZL's opposition papers list a series of statements by Gartner

suggesting that the opinions in the MQ Report, including ZL's placement on the Magic Quadrant,

are based upon undisclosed facts: "our opinions are grounded in a solid base of facts verified by

our own experienced analysts and others in business and academia," FAC ¶ 60; "analysts'

opinions are grounded in a consistent methodology and fact-based analysis," *id.* ¶ 61; "Gartner

insights are drawn from a critical fact base not available anywhere else, *id.* ¶ 62; and "Gartner

provides highly qualified, independent, objective and accurate advice to our clients...[W]e

provide insight based on the facts as our analysts see them, without unfair or undue influence."

*Id.* ¶ 63.

20

Case Number CV 09-02393 JF (PVT)
ORDER GRANTING MOTION TO DISMISS
(JFLC1)

However, the Supreme Court in *Milkovich* and the Ninth Circuit in *Unelko* were concerned about whether a challenged statement itself "implies the assertion of an *objective* fact" (emphasis added), not whether the statement rests or implies that it rests on *undisclosed* fact. Gartner does not deny that its opinions, including its description of ZL as a Niche Player are extrapolated from undisclosed facts. Rather, Gartner contends that because the Alleged Defamatory Statements do not imply the assertion of specific *objective* facts, they are not actionable – even though they undeniably rest upon a large body of specific yet undisclosed facts. Once again, the Court finds Gartner's argument persuasive.

In *Unelko*, the plaintiff brought suit against Andy Rooney, who had opined on *60 Minutes* that the plaintiff's "Rain-X" product "didn't work." The court found Rooney's unelaborated statement actionable because it *implied* a specific factual assertion, not because it was *based* upon undisclosed facts. *Unelko*, 912 F.2d at 1055 (Rooney's comment that Rain-X "didn't work" necessarily implied the specific fact that Rain-X did not perform the functions for which it was sold). As is evident from the MQ Report itself, a company's MQ rating reflects Gartner's *opinion* as to whether the company is a Leader, Visionary, Challenger, or Niche Player. Gartner makes this determination by looking to a number of factors, applying differing weights based on its subjective assessment of a company's ability to execute and completeness of vision. *See Compuware Corp v. Moody's Investors Servs., Inc.*, 499 F.3d 520, 529 (6th Cir. 2007) (holding that where the credit rating was "dependent on a subjective and discretionary weighing of complex factors," the rating itself did not "communicate[] any provably false factual connotation"). In fact, ZL itself alleges that, "Gartner explicitly states that its 'Completeness of

21

Vision' standard – fully half of the Magic Quadrant rating – is based on whether the 'vendor's view of how the market will develop matches Gartner's perspective.'" FAC ¶ 69.  Unlike the facts implied by Rooney's opinion in *Unelko*, the differing weights applied to the MQ criteria are not facts that can be proved true or false but a reflection of a subjective valuation by Gartner.[3]  Unlike Rooney's statement in *Unelko*, the MQ Report cannot be read to imply any specific facts that can be proved true or false.

Finally, Gartner need not provide full disclosure of the factual basis for an opinion that does not imply any actionable assertion of fact.  If a defendant had to provide support for each fact forming the basis of its opinion in order to be entitled to First Amendment protection, an exhaustive and unreasonable inquiry into the materiality of facts disclosed or undisclosed necessarily would ensue in virtually all defamation and trade libel cases.[4]

___

[3]  ZL alleges that its product's performance is superior to that of Symantec's comparable product.  FAC ¶ 94 (asserting that, "based on objective, quantifiable, and verifiable measures, ZL's offering outperform those of Symantec in the areas of (a) search accuracy, (b) search speed, and (c) completeness of search, which are the critical measure for email archiving software"); *id.* (claiming that "the future prospects for ZL's products are also superior to those of Symantec, which sells software based on search technology widely acknowledged to be outdated.")  While these objective characteristics of ZL's product are capable of being proved true or false, the MQ Report nowhere suggests that ZL's products do not possess these qualities.  To the contrary, the MQ Report explicitly credits ZL's positive product quality, while at the same time cautioning that to remain viable in the market the company needs to invest more in marketing. RJN Ex. C at 17.

[4]  Because it has determined that the Allegedly Defamatory Statements at issue are not statements of fact, the Court does not address the parties' arguments as to whether ZL has pled actual malice adequately, except to note that an inherent economic bias does not strip away First Amendment protection of pure opinion.  *Harte-Hanks Communications v. Connaughton,* 491 U.S. 657, 667, 109 S.Ct. 2678, 2686, 105 L.Ed.2d 562 (1989) (holding that "[i]f a profit motive could somehow strip communications of the otherwise available constitutional protection, our cases from New York Times to Hustler Magazine would be little more than empty vessels.

22

1

2

**C. Leave to Amend**

3

Leave to amend should be granted unless it is clear that the complaint's deficiencies

4

cannot be cured by amendment. *Lucas v. Dep't of Corr.*, 66 F.3d 245, 248 (9th Cir. 1995).

5

When amendment would be futile, dismissal may be ordered with prejudice. *Dumas v. Kipp*, 90

6

F.3d 386, 393 (9th Cir. 1996). When the Court granted ZL leave to amend its original complaint,

7

it provided additional discussion of the defects in that pleading. In a footnote in its opposition

8

papers, ZL requests leave to amend once again, but it offers no indication of what additional facts

9

it might plead or theories it might assert if leave were granted. Because the Court discerns no

10

way in which additional factual allegations could place the Alleged Defamatory Statements

11

outside the protections of the First Amendment, leave to amend will be denied. *Partington*, 56

12

F.3d at 1162 (affirming the district court's dismissal without leave to amend of defamation and

13

false light claims when the alleged defamatory statements were held to be non-actionable

14

opinions protected by the First Amendment); *Albrecht v. Lund*, 845 F.2d 193, 195 (9th Cir. 1988)

15

(holding that "[i]f the district court determines that the 'allegation of other facts consistent with

16

the challenged pleading could not possibly cure the deficiency,' then the dismissal without leave

17

18

19

20

Actual malice, instead, requires at a minimum that the statements were made with a reckless

21

disregard for the truth. And although the concept of 'reckless disregard' 'cannot be fully
encompassed in one infallible definition," *St. Amant v. Thompson,* 390 U.S. 727, 730, 88 S.Ct.

22

1323, 1325, 20 L.Ed.2d 262 (1968), we have made clear that the defendant must have made the
false publication with a "high degree of awareness of ... probable falsity," *Garrison v. Louisiana,*

23

379 U.S. 64, 74, 85 S.Ct. 209, 215, 13 L.Ed.2d 125 (1964), or must have "entertained serious
doubts as to the truth of his publication," *St. Amant*, supra, 390 U.S. at 731, 88 S.Ct., at 1325);

24

*see also Avvo*, 525 F.Supp.2d at 1252 n. 1 (recognizing that "[c]omparisons and comparative

25

ratings are often based as much on the biases of the reviewer as on the merits of the reviewed:
they should, therefore, be relied upon with caution.")

26

23

27

Case Number CV 09-02393 JF (PVT)

28

ORDER GRANTING MOTION TO DISMISS
(JFLC1)

to amend is proper"); *Browne,* 525 F.Supp.2d at 1255 (dismissing plaintiff's claims of defamation and libel without leave to amend after concluding that defendant's evaluative rankings were non-actionable opinions protected by the First Amendment).

### IV. ORDER

Good cause therefor appearing, the motion to dismiss is GRANTED, without leave to amend.  The Clerk shall enter judgment and close the file.

**IT IS SO ORDERED.**

Dated: May 3, 2010

_____
JEREMY FOGEL
United States District Judge

Case Number CV 09-02393 JF (PVT)
ORDER GRANTING MOTION TO DISMISS
(JFLC1)

24